JUDGE KAPLAN



12 CIV 5280

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN KALAWAY, individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | **JURY TRIAL DEMANDED** |
| BARCLAYS, PLC; BARCLAYS BANK, PLC; BARCLAYS CAPITAL, INC.; CITIGROUP, INC.; CITIBANK, N.A.; DEUTSCHE BANK, A.G.; JPMORGAN CHASE & CO.; HSBC HOLDINGS PLC; HSBC BANK PLC; COÖPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK, B.A.; UBS, A.G. and UBS (LUXEMBOURG) S.A. | |
| Defendants. | |



Plaintiff, Karen Kalaway, alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of its counsel. The investigation included, for example: (i) review and analysis of European Interbank Offered Rates ("EURIBOR") and the differences therefrom of similar interest rates; (ii) review and analysis of court filings of other cases; and (iii) review and analysis of media reports; and (iv) additional materials. Many of the facts related to Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I.  SUMMARY OF THE ACTION

1.  This case is brought to recover for the injuries sustained by Plaintiff and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and

Rule 23 of the Federal Rules of Civil Procedure. This case also brings claims under the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* The Plaintiff Class, defined more fully below, consists of all persons and entities in the United States that purchased or sold EURIBOR-related financial instruments during the period from January 1, 2005, through December 31, 2009.

2. For purposes of this complaint, the term "EURIBOR-related financial instruments" means financial instruments which are either traded on an exchange (such as the NYSE Euronext) or exchanged in over the counter transactions, and include, but are not limited to, futures contracts, forward rate agreements, options, credit default swaps, asset swaps, interest rate swaps, collateralized debt obligations, and total return swaps.

3. Throughout the Class Period, the Defendants named herein conspired to artificially manipulate the reported EURIBOR, which is the baseline interest rate used in the valuation of more than $200 trillion in derivative financial products.

4. Although, as the Defendants were fully aware, EURIBOR is one of the most important interest rate calculations in the world, with trillions of dollars of loans and other financial products directly tied to it, the rate is set by subjective responses submitted by a handful of multinational banks, including the Defendants, that had a strong incentive to manipulate EURIBOR.

5. The Defendants yielded to these incentives and conspired to manipulate EURIBOR for their own selfish reasons, knowing full well that this manipulation would have disastrous ramifications for the multitude of persons in the United States, including the Class Members of this case, who suffered damages when the value of their EURIBOR-related financial instruments suffered because of inaccurate EURIBOR presentations that were engineered by the Defendants.

6. As further described below, Defendants Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc. recently agreed to pay a record amount of fines for engaging in the conduct alleged herein. Other Defendants named herein are also under investigation by regulators around the globe for manipulating EURIBOR, including investigators and regulators in the United States such as the United States Department of Justice, the U.S. Commodities Futures Trading Commission, and the Securities Exchange Commission.

## II. JURISDICTION AND VENUE

7. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations.

8. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 22 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

9. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

10. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.   THE PARTIES

**A.   Plaintiff**

11.   Plaintiff Karen Kalaway is and has been a citizen of the United States and currently resides in London, England. During the Class Period, plaintiff Karen Kalaway was the principal of Riff-Raff Trading, Inc., an Illinois corporation with its principal place of business at 820 North Inverway, Inverness, Illinois. Plaintiff Kalaway owns all claims possessed by Riff-Raff Trading, Inc. During the Class Period, Riff-Raff Trading was engaged in the purchase and/or sale of futures contracts, including EURIBOR futures contracts. During the Class Period, Riff-Raff Trading, Inc. purchased, among other things, three month EURIBOR futures contracts and was damaged by the conspiracy alleged herein.

**B.   Defendants**

12.   Defendant Barclays, PLC is a United Kingdom public limited liability company headquartered at 1 Churchill Place, London, England. It has operations in over 50 countries including in the United States. At all times relevant to this complaint, defendant Barclays, plc, either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Barclays, plc participated in and had knowledge of Barclays' daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

13.   Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered at 1 Churchill Place, London, England. It is engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services. Barclays Bank PLC is wholly owned by defendant Barclays, PLC. At all times relevant to this complaint, defendant Barclays Bank, plc, either directly or indirectly through a wholly owned subsidiary or sister company, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Barclays Bank, plc participated in and had knowledge of Barclays' daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

14. Defendant Barclays Capital Inc. is a wholly owned subsidiary of Barclays PLC and engages in investment banking, wealth management and investment management services. Defendant Barclays Capital, Inc. is a wholly owned subsidiary of Barclays, PLC. Defendant Barclays Capital, Inc. maintains a business address and active trading office in New York city. At all times relevant to this complaint, defendant Barclays Capital, Inc., either directly or indirectly through a wholly owned subsidiary or sister company, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Barclays Capital, Inc., participated in and had knowledge of Barclays' daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint. Defendants Barclays, plc, Barclays Bank, plc, and Barclays Capital, Inc. are collectively referred to herein as the "Barclays Defendants."

15. Defendant Citigroup, Inc. is a Delaware corporation which is headquartered at 399 Park Avenue, New York, New York. At all times relevant to this complaint, defendant Citigroup, Inc., either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Citigroup, Inc. participated in and had knowledge of Citigroup's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

16. Defendant Citibank, N.A. is a federally chartered national banking association headquartered at 399 Park Avenue, New York, New York. Defendant Citibank, N.A. is a wholly owned subsidiary of defendant Citigroup, Inc. Defendants Citigroup, Inc. and Citibank, N.A. are collectively referred to herein as "Citigroup." At all times relevant to this complaint, defendant Citibank, N.A., either directly or indirectly through a wholly owned subsidiary or sister company, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Citibank, N.A. participated in and had knowledge of Citigroup's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

17.     Defendant Deutsche Bank A.G. ("Deutsche") is a German financial services company headquartered in Frankfurt am Main, Germany. Deutsche touts itself as the largest financial institution in Germany, and one of the largest financial institutions in Europe and the world having assets totaling over $2 trillion at the end of 2011. At all times relevant to this complaint, defendant Deutsche, either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Deutsche participated in and had knowledge of Deutsche's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

18.     Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England. At all times relevant to this complaint, defendant HSBC Holdings plc, either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of HSBC Holdings plc participated in and had knowledge of HSBC's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

19.     Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank plc is a wholly owned subsidiary of defendant HSBC Holdings, plc. Defendants HSBC Holdings, plc and HSBC Bank, plc are collectively referred to herein as "HSBC." At all times relevant to this complaint, defendant HSBC Bank plc, either directly or indirectly through a wholly owned subsidiary or sister company, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of HSBC Bank plc participated in and had knowledge of HSBC's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

20.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial holding company formed under the laws of Delaware, and headquartered at 270 Park Avenue, New York, New York. At all times relevant to this complaint, defendant JPMorgan Chase, either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of JPMorgan Chase

participated in and had knowledge of JPMorgan Chase's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

21. Defendant Coöperative Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands. At all times relevant to this complaint, defendant Rabobank, either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of Rabobank participated in and had knowledge of Rabobank's daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

22. Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland. At all times relevant to this complaint, defendant UBS AG, either directly or indirectly through a wholly owned subsidiary, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of UBS AG participated in and had knowledge of UBS' daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

23. Defendant UBS (Luxembourg) S.A. is a corporation incorporated under the laws of Luxembourg. Defendant UBS (Luxembourg) S.A. is a wholly owned subsidiary of defendant UBS A.G. Defendants UBS A.G. and UBS (Luxembourg) S.A. shall be collectively referred to herein as "UBS." At all times relevant to this complaint, defendant UBS (Luxembourg) S.A., either directly or indirectly through a wholly owned subsidiary or sister company, was a member of the European Banking Federation's EURIBOR Panel of banks. Officers and executives of UBS (Luxembourg) S.A. participated in and had knowledge of UBS' daily EURIBOR submissions and participated in the illegal conduct alleged in this complaint.

### IV. FACTUAL BACKGROUND

**A.  The European Banking Federation - EBF**

24. The European Banking Federation, according to its own website, is "an international non-profit making association under Belgian law founded in 1999 with the launch of the Euro and based in Brussels (10, rue Montoyer, 1000 Brussels). Its members are national banking associations in the Member States of the European Union which are involved in the

Eurozone and the Euro-system." One of the most important functions of the EBF, if not the most important function, is the daily fixing of EURIBOR.

**B.  EURIBOR**

25.  EURIBOR is an acronym for the European Interbank Offered Rate, the predominant money market reference interest rate for the Euro currency.

26.  EURIBOR is one of the most important and widely used financial baselines in the world. According to publicly available sources, over the counter interest rate derivative contracts tied to EURIBOR, such as swaps and forward-rate agreements, comprised contracts worth over $175 trillion in notional value referenced to Euro rates at the end of 2009 and over $220 trillion at the end of 2011.

27.  EURIBOR is defined as follows:

> **Euribor** is the rate at which Euro interbank term deposits are offered by one prime bank to another prime bank within the EMU zone, and is published at 11:00 a.m. (CET) for spot value (T+2).[1]

28.  Although EURIBOR is a benchmark interest rate that is defined as "the rate at which Euro interbank term deposits are offered by one prime bank to another prime bank within the EMU zone, and is published at 11:00 a.m. (CET) for spot value (T+2)," billions, and perhaps trillions, of dollars of EURIBOR-related financial instruments are traded in the United States by U.S citizens and U.S. based entities.

29.  Euribor is determined using submissions from a panel of approximately 40 banks, primarily from within the Monetary Union of the European Union ("EMU"). The EBF requires that the panel banks quote the required euro rates to "the best of their knowledge." The definition of EURIBOR does not permit consideration of factors unrelated to the cost of borrowing of unsecured funds. For example, panel member banks are not permitted to quote EURIBOR rates based on the EURIBOR-related financial instruments held by the panel bank.

---

[1] http://www.euribor-ebf.eu/euribor-org/about-euribor.html.

30.     Each day, EURIBOR panel banks submit their EURIBOR rates electronically to Thomson Reuters, which manages the EURIBOR process by collecting the submitted rates from the EURIBOR panel banks, calculates the rate, and then releases the rate for publication just before noon Central European Time. The publication of the EURIBOR rate is made throughout the world including in the United States.

31.     Thomson Reuters computes each day's EURIBOR by eliminating the highest and lowest fifteen percent of submissions and averaging the remaining submissions. The average becomes the daily EURIBOR. EURIBOR is calculated each day for 15 different durations ranging from one week to 12 months.

C.      **Overview of EURIBOR-Related Financial Instruments**

32.     Derivative securities, commonly known as "derivatives", are an important component of the financial markets. Derivatives are securities whose prices are determined by, or "derive from", the prices of other securities or financial indexes. Options and forward contracts (which include futures and swaps) are two types of derivatives. The value of certain options, futures and swaps are determined, at least in part, by the EURIBOR published by the EBF/Thomson Reuters.

33.     "Options" are derivative contracts that give the holder of the option the right to either purchase an asset at a particular price (Call Option) or to sell an asset at a particular price (Put Option) for a particular period of time.

34.     "Forward contracts" are similar to options in that they specify the purchase or sale of some underlying asset at some particular future date. The primary difference between futures and options is that while the option holder is not compelled to buy or sell, the holder of a futures contract *must* buy or sell the asset at the close of the time period.

35.     Swaps are a particular type of forward contract that allow the holder to exchange cash flows related to one instrument for the cash flows related to another instrument for a particular period of time. For example, if a person thought that interest rates might rise in the future, he would enter into a swap that would give him the cash flows related to a variable bond

while he would agree to pay the cash flows related to a fixed-rate bond. Thus, changes to EURIBOR are a key determinant in whether such a swap is profitable or unprofitable for the investor.

## V.  MISCONDUCT BY THE DEFENDANTS

36.  The Defendants had both the motive and the opportunity to manipulate EURIBOR by providing false information to the EBF, which, in turn, would manipulate EURIBOR and create artificial EURIBOR.

37.  Beginning in at least as early as 2005, the Defendants intentionally created and caused to be created artificial EURIBOR. Defendants did this in order to benefit the value of EURIBOR derivatives that the Defendants were holding. For example, if a Defendant desired EURIBOR to increase in order to maximize the value of its EURIBOR-related derivatives, then it would submit artificially high EURIBOR rates to the EBF and vice versa. As there are a number of banks on the EBF EURIBOR panel, Defendants also communicated, coordinated and agreed with other banks to artificially manipulate EURIBOR in order to make sure the desired EURIBOR was achieved.

38.  For example, in its recent admission of wrongdoing, the Barclays Defendants have admitted that their EURIBOR submissions during the Class Period were not based on what it believed the rate that "Euro interbank term deposits are offered by one prime bank to another prime bank with the EMU," but rather were based on what they desired the EURIBOR to be in order to benefit derivative positions held by Barclays.

39.  During the Class Period, EURIBOR swap traders located in Barclays' London office made requests to those at Barclays who were responsible for submitting Barclays' daily EURIBOR submission, to raise or lower the EURIBOR rate for the purpose of affecting the official EURIBOR in order to benefit the EURIBOR-related derivatives positions being held by Barclays. In addition, certain of these traders at Barclays were in regular contact with traders at other EBF EURIBOR Panel banks, to coordinate the rates that each of the banks would submit for the purpose of affecting the official EURIBOR.

010319-11 534267 V1

40. Barclays recently publicly admitted that its traders' practice of requesting that Barclays EURIBOR submitters raise or lower the EURIBOR submission based on its derivatives holdings was an "open, common and pervasive practice," within Barclays. In fact, Barclays admitted that traders would, among other things, shout across the trading desks to fellow traders to confirm there were no conflicting requests before they sent their requests to the Barclays EURIBOR submitters.

41. In connection with the CFTC's investigation, Barclays produced numerous documents including emails, instant messaging chats, calendar entries and other documents, which detailed Barclays' improper conduct alleged herein. Below are just some of the examples of the conversations which took place within Barclays in furtherance of the illegal conduct alleged herein relating to EURIBOR:

**September 7, 2006**

Senior Barclays Euro Swaps Trader: "I have a huge 1m fixing today and would really help to have a low 1m tx a lot."

Euribor Submitter: "I'll do my best."

Senior Barclays Euro Swaps Trader: "because I am aware some other bank need a very high one . . . if you could push it very low it would help. I have 50bn fixing."

**January 12, 2007**

Senior Barclays Euro Swaps Trader: "hi [Euribor submitter]. We need a low 1m in the coming days if u can . . . . ."

Euribor Submitter: "hi [Senior Barclays Euro Swaps Trader], we will keep the 1 mth low for a few days."

**April 2, 2007**

Senior Barclays Euro Swaps Trader: "hello [Euribor submitter], could you please put in a high 6 month euribor today?"

Euribor Submitter: "will do."

42. Barclays has also admitted that in addition to coordinating internally their EURIBOR submission, Barclays traders were in regular contact with traders at other panel banks in order to affect the official EURIBOR. Certain of Barclays' traders spoke daily with traders at other banks concerning their respective derivatives positions in order to determine how to change the official EURIBOR fixing in a manner that benefitted their derivatives positions. In these conversations, the traders at other EURIBOR Panel banks agreed to contact their respective EURIBOR submitters to request the agreed upon EURIBOR submission. Barclays traders, at various times, also received requests from traders at other EURIBOR Panel banks, for certain EURIBOR submissions, which the Barclays traders would then pass along to the Barclays EURIBOR submitter as if it were their own request. The following comes from the June 27, 2012 CFTC Order against the Barclays Defendants, which the Barclays Defendants have admitted to:

> In one instance of coordination over a four-month period, the Barclays senior Euro swaps trader orchestrated an effort to align trading strategies among traders at multiple banks with the goal of influencing the official EBF three month Euribor fixing on the International Monetary Market ("IMM") date of March 19, 2007, in order to profit from their futures trading positions. This scheme began at least in December 2006 and continued until the March 2007 IMM date. It involved multiple and successive requests over this period of time by the Barclays senior Euro swaps trader to Barclays' Euribor submitters and traders at other banks to lower the three-month Euribor submission on dates leading up to and including the March 2007 IMM date.

## VI.   GOVERNMENTAL INVESTIGATIONS

43. Several governmental and regulatory agencies, including the U.S. Commodity Futures Trading Commission and the United States Department of Justice, have commenced investigations into the EURIBOR reporting practices of the Defendants during the Class Period.

44. For example, on June 27, 2012, the United States Department of Justice and the CFTC, jointly announced that the Barclays Defendants had admitted to manipulating EURIBOR

(as well as LIBOR) during the period of 2005 through 2009. As a result of such admission, Barclays has agreed to pay $200 million in civil fines to CFTC, the largest fine ever imposed by the CFTC. In addition, Barclays agreed to pay a $160 million criminal penalty to the US DOJ for its manipulation of EURIBOR and LIBOR. Finally, Barclays had also agreed to pay the United Kingdom Financial Services Authority £59.5 million in fines for its conduct with respect to EURIBOR and LIBOR.

45. Other Defendants named herein have acknowledged that they are also the subject of various criminal and civil investigations being conducted around the world regarding EURIBOR. Such investigations include investigations being conducted by the United States Department of Justice, the CFTC, and the SEC.

## VII. FRAUDULENT CONCEALMENT

46. Throughout and beyond the conspiracy, Defendants affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiff and the Class. Defendants conducted their conspiracy in secret. Defendants publicly provided pretextual and false justifications regarding their role in setting EURIBOR. Defendants conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.

47. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws and the Commodities Exchange Act as alleged herein until shortly before this litigation was commenced. It was at that time that the Barclays defendants admitted their role in manipulating EURIBOR and agreed to pay over $400 million in civil and criminal fines.

48. As a result of the concealment of the conspiracy by Defendants and their coconspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

### VIII. THE CONDUCT HAD AN EFFECT ON U.S. COMMERCE

49.    Each of the Defendants was aware that their misconduct in manipulating EURIBOR would have a direct, substantial and reasonably foreseeable effect on EURIBOR-related financial instruments.

### IX.    CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of itself and all persons or entities (the "Class") located in the United States and who purchased or sold EURIBOR-related financial instruments during the period from January 1, 2005, through December 31, 2009 (the "Class Period").

51.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed Class, who may be identified from records maintained by the Defendants and/or may be notified of this action using the form of notice customarily used in class actions;

(b)    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(d)     A class action is superior to all other methods for a fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

52.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

(a)     Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize EURIBOR;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Plaintiff Class;

(f)     The effect of Defendants' alleged conspiracy on EURIBOR during the Class Period; and,

(g)     The appropriate class-wide measure of damages.

## COUNT I

**(For Violation Of Section 1 Of The Sherman Act)**

53.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

54.     Beginning at a time presently unknown to Plaintiff, but at least by 2005, and continuing through 2009, the exact dates being unknown, Defendants and their co-conspirators entered into a continuing agreement, combination and conspiracy in restraint of trade to artificially lower, fix, maintain, and/or stabilize EURIBOR, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

55.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, lowered, maintained, and/or stabilized EURIBOR. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

56.     The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

57.     The contract, combination or conspiracy has had the effect, among others, of falsely reporting EURIBOR other than what it otherwise should have been, thus directly impacting the value of financial instruments that are tied to EURIBOR.

58.     As a proximate result of the Defendants' unlawful conduct, Plaintiff and Class members have suffered injury in that the value of EURIBOR-related financial instruments they owned was less than it otherwise should have been, had EURIBOR been accurately calculated and stated.

## COUNT II

**(For Violation Of The Commodity Exchange Act)**

59. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

60. By their intentional misconduct as alleged herein, the Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of EURIBOR-based financial instruments to be artificially increased or decreased during the Class Period.

61. Defendants' manipulation of EURIBOR constituted market manipulation of the prices of EURIBOR-related financial instruments in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

62. Defendants' conduct deprived Plaintiff and the other Class Members of a lawfully operating market during the Class Period.

63. Plaintiff and the other Class Members that transacted in EURIBOR-related financial instruments during the Class Period transacted their trades at artificial and unlawful prices resulting from Defendants' misconduct in violation of the CEA, and as a direct result, sustained injury and suffered damages.

64. Plaintiff and the other Class Members are each entitled to damages for the violations of the CEA alleged herein.

## COUNT III

**(For Vicarious Liability)**

65. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

66. Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

010319-11 534267 V1

17

## COUNT IV

### (For Aiding And Abetting Violation Of The Commodity Exchange Act)

67.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

68.     Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each others' manipulation of EURIBOR, and willfully intended to assist these manipulations, which resulted in EURIBOR-related financial instruments trading at artificial prices during the Class Period, in violation of the CEA, 7 U.S.C. § 25(a)(1).

## X.     RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.  Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

B.  Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such other relief as the Court may deem just and proper.

## XI.     JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

DATED: July 6, 2012

        HAGENS BERMAN SOBOL SHAPIRO LLP

        By: _____
            Jason A. Zweig (JZ-8107)
        One Penn Plaza, 36th Floor
        New York, NY 10119
        Tel: (212) 786-7347
        Fax: (917) 210-3980
        jasonz@hbsslaw.com

        HAGENS BERMAN SOBOL SHAPIRO LLP
        Steve W. Berman
        Karl P. Barth
        1918 Eighth Avenue, Suite 3300
        Seattle, WA 98101
        Telephone: (206) 623-7292
        Facsimile: (206) 623-0594
        steve@hbsslaw.com
        karlb@hbsslaw.com

        *Counsel for Plaintiffs and the Proposed Class*